UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEVEN STANEFF, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:25-CV-0353-B |
| | § | |
| ONSITE HEALTH DIAGNOSTICS, LLC, | § | |
| and JUSTIN SIMONS, | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM OPINION AND ORDER

Before the Court is the Motion to Compel Arbitration (Doc. 4) filed by Defendants Onsite Health Diagnostics, LLC ("OHD") and Justin Simons (collectively, "Defendants"). For the following reasons, Defendants' Motion is **GRANTED IN PART and DENIED IN PART**.

### I.

### BACKGROUND

Plaintiff Steven Staneff used to own OHD, until he sold it in 2024 to Simons' company, Sim-Metry Medical Group, LLC ("Sim-Metry"). Doc. 1, Compl., ¶ 10. Staneff continued working as OHD's president after the sale and remained a member of OHD. *Id.* at ¶¶ 10-11, 14. Staneff was supposed to receive a semi-monthly salary. *Id.* at ¶ 11. But OHD failed to pay Staneff multiple paychecks from September 2024 to January 2025. *Id.* ¶ 12. Staneff then brought this lawsuit alleging that OHD and Simons violated the Fair Labor Standards Act ("FLSA") for failing to pay him his salary and overtime wages. *Id.* ¶¶ 15–22. He also sues OHD for breach of contract. *Id.* ¶¶ 23–24.

At OHD's founding, Staneff was one of six original members of OHD that approved and executed the Original Company Agreement ("Original Agreement") in 2004. Doc. 20-1, Resp., Ex. 1, Orig. Agreement, 25. The Original Agreement did not contain an arbitration provision. It did, however, contain an amendment provision laying out the three steps necessary to validly amend the Original Agreement. *Id.* at 23. First, the amendment must be proposed by the Board of Managers. *Id.* Second, the proposed amendment must be submitted to all members in writing. *Id.* Third, the proposed amendment must be approved by affirmative vote or written consent of "Majority-in-Interest of the Members." *Id.* The Original Agreement defines "Board of Managers" as the managers of OHD collectively. *Id.* at 9. A "Majority-in-Interest of the Members" is defined as "Class A members having the right to vote more than fifty percent (50%) of total Class A interests in the Company." *Id.*

At some point prior to the OHD sale to Sim-Metry, Staneff acquired all of the outstanding interest of OHD. Doc. 20-3, Resp., Ex. 3, Pl.'s Aff., ¶ 2. In early 2024, Staneff sold 90% of his interest in OHD to Sim-Metry. *Id.* at ¶ 3. Simons then became OHD's CEO and manager. Doc. 4, Mot. Compel Arb., ¶ 3. In summary, Sim-Metry acquired 90% of OHD's member-interest, and Simons retained his 10% member-interest in OHD. *Id.* at ¶ 3.

Simons, now manager of OHD, moved to amend the Original Agreement. Doc. 4-1, Mot., Ex. 1, Def.'s Decl., ¶ 6. In July 2024, Simons provided a draft of the Amended Company Agreement (the "Amended Agreement") to Staneff in printed from and email but received no feedback or response from Staneff, even after Simons sent multiple follow-up emails. *Id.* After months passed with no acknowledgement from Staneff, Simons, as the sole manager of both OHD and Sim-Metry,

voted to accept and adopt the Amended Agreement on December 18, 2024. *Id.* at ¶¶ 7-8. Staneff never signed the Amended Agreement. Doc. 20-3, Pl.'s Aff., ¶ 5.

Relevant here, the Amended Agreement includes Section 11.14 Dispute Resolution provision. Doc. 4-1, Mot., Ex. 1-B, Am. Agreement, 62. In relevant part, Section 11.14(b) states: "ANY DISPUTE RELATING TO THIS AGREEMENT AND/OR DISPUTES THAT IN ANY WAY RELATE TO OR INVOLVE THE RELATIONSHIP OF THE DISPUTE PARTIES SHALL BE SUBMITTED TO BINDING ARBITRATION . . . ." *Id.* The Dispute Parties are defined as "the Company, Members, and Manager." *Id.* Furthermore, the arbitration must be conducted by the American Arbitration Association ("AAA") and under the AAA's commercial rules. *Id.* Lastly, Section 11.14(c) states: "THE ARBITRABILITY OF ANY DISPUTE, CLAIM, CAUSE OF ACTION, AND/OR ASSERTION OF LIABILITY AND/OR DAMAGES SHALL BE DETERMINED BY THE ARBITRATOR." *Id.* at 63.

Defendants move to compel arbitration pursuant to the Dispute Resolution provision. Doc. 4, Mot., 5. Plaintiff filed a Response in Opposition (Doc. 20, Resp., 6), and Defendants filed a reply (Doc. 21, Reply, 1-2). Therefore, this Motion is ripe for the Court's review.

## II.

## LEGAL STANDARD

The Federal Arbitration Act ("FAA")'s "principal purpose is to 'ensur[e] that private arbitration agreements are enforced according to their terms.'" *Imperial Indus. Supply Co. v. Thomas*, 825 F. App'x 204, 206 (5th Cir. 2020) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011)). "As a result of the FAA, there is a strong federal policy favoring arbitration." *Id.* (internal quotation marks and citation omitted). Under the FAA, "[a] written provision in any . . . contract

evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Because of the policy favoring arbitration, "a party seeking to invalidate an arbitration agreement bears the burden of establishing its invalidity." *Carter v. Countrywide Credit Indus.*, 362 F.3d 294, 297 (5th Cir. 2004) (citation omitted).

The Fifth Circuit follows a two-step procedure to decide whether to compel arbitration: (1) "determine whether the parties agreed to arbitrate the dispute in question," and (2) "determine whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims." *Webb v. Investacorp, Inc.*, 89 F.3d 252, 257-58 (5th Cir. 1996) (per curiam) (internal quotation marks and citations omitted). Because neither party asserts that a federal statute or policy prohibits arbitration here, the Court only evaluates the first step. *See Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 381 (5th Cir. 2008) (per curiam) ("As neither party argues that a federal statute or policy would bar arbitration here, the issue before us is limited to the analysis's first step.").

In conducting the first step of the analysis—whether the parties agreed to arbitrate the dispute in question—a court will find an agreement where: (1) there exists between the parties "a valid agreement to arbitrate"; and (2) the "dispute in question falls within the scope of that arbitration agreement." *Pers. Sec. & Safety Sys. Inc. v. Motorola Inc.*, 297 F.3d 388, 392 (5th Cir. 2002) (citation omitted). Ordinarily, the second question is one for the Court, but "where the arbitration agreement contains a delegation clause giving the arbitrator the primary power to rule on the arbitrability of a specific claim, the analysis changes." *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995)). "[A] valid delegation

clause requires the court to refer a claim to arbitration to allow the arbitrator to decide gateway arbitrability issues." *Id.* at 202 (citation omitted). "If there is a delegation clause, the motion to compel arbitration should be granted in almost all cases." *Id.* (footnote omitted).

### III.

### ANALYSIS

Defendants move the Court to compel arbitration, stay this suit until arbitration concludes under AAA Case No. 01-25-0001-2819, and grant their request for attorney's fees and costs. Doc. 4, Mot., 20. The parties dispute the existence of a valid arbitration agreement and delegation clause. The Court evaluates the validity of the agreement to arbitrate and delegation clause below.

A.  *There is a Valid Agreement to Arbitrate*

"The party seeking to compel arbitration need only prove the existence of an agreement to arbitrate by a preponderance of the evidence." *Grant v. Houser*, 469 F. App'x 310, 315 (5th Cir. 2012) (per curiam) (citation omitted). "In determining the contractual validity of an arbitration agreement, courts apply ordinary state-law principles that govern the formation of contracts." *Carter*, 362 F.3d at 301 (5th Cir. 2004) (citing *Kaplan*, 514 U.S. at 944). Under Texas law, the party seeking to compel arbitration must establish that the alleged agreement satisfies the elements of a binding contract.[1] *Huckaba v. Ref–Chem, L.P.*, 892 F.3d 686, 688 (5th Cir. 2018).

To show the parties entered into an agreement to arbitrate some set of claims, Defendants point to the Amended Agreement's Dispute Resolution provision, which states "[t]he Company, Members, and Manager agree to use the following dispute resolution provisions to resolve any

---

[1] "[A] binding contract requires '(1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with intent that it be mutual and binding.'" *Coffel v. Stryker Corp.*, 284 F.3d 625, 640 n.17 (5th Cir. 2002) (citation omitted).

dispute by, between, and amongst them[.]" Doc 4-1, Am. Agreement, 62. The Dispute Resolution section mandates the Dispute Parties first attend non-binding mediation. *Id.* If that fails, then "ANY DISPUTE RELATING TO THIS AGREEMENT AND/OR DISPUTES THAT IN ANY WAY RELATE TO OR INVOLVE THE RELATIONSHIP OF THE DISPUTE PARTIES SHALL BE SUBMITTED TO BINDING ARBITRATION[.]" *Id.* It is undisputed that the parties attended mediation on March 7, 2025, and were unable to resolve their dispute. Doc. 4, Mot., ¶ 10.

Although the Amended Agreement clearly contains an arbitration provision, the Court must determine whether its binds the parties. First, the Court determines whether Staneff agreed to arbitrate by agreeing to the Original Agreement's amendment protocol that added the Dispute Resolution provision. Recall that Staneff only signed the Original Agreement, which did not contain an arbitration clause. Second, the Court determines whether OHD and Simons can compel Staneff to arbitration.

1. <u>Because the Original Agreement was Properly Amended, the Dispute Resolution Provision Binds Staneff</u>

Defendants offer the Original Agreement (Doc. 4-1, Orig. Agreement, 8-33) and a declaration from Simons (Doc. 4-1, Def.'s Decl., 2-6) to support their Motion. Under the Original Agreement, three requirements must be satisfied to amend the company agreement:

1. The amendment must be proposed by the Board of Managers;
2. The amendment must be submitted to all Members in writing; and
3. Subject to certain exceptions, approval of the amendment requires an affirmative vote or written consent of a "Majority-in-Interest of the Members."

Doc. 4-1, Orig. Agreement, 30.

Here, Defendants satisfied all three requirements to amend the Original Agreement. Simons, the sole manager of OHD, proposed the Amended Agreement to OHD members Staneff and Sim-Metry. In fact, Simons submitted the Amended Agreement to Staneff multiple times. But

Staneff did not sign the Amended Agreement. Sim-Metry, which held 90% of OHD's membership interest, voted to approve the Amended Agreement on December 18, 2024. Since Simons followed the requirements to amend the Company Agreement, the Court finds the Amended Agreement was properly enacted.

By signing the Original Agreement and consenting to the amendment protocol, Staneff bound himself to the contents of the Amended Agreement, including the Dispute Resolution provision. In reaching its conclusion, the Court finds the Texas Supreme Court case *Pinto Tech. Ventures, L.P. v. Sheldon*, 526 S.W.3d 428 (Tex. 2017) instructive. In *Pinto*, a company attempted to enforce a Delaware forum-selection clause[2] but was opposed by a minority shareholder that had not signed the 2006 shareholder agreement that added the Delaware forum-selection clause. *Id.* at 434. The minority shareholder argued the Delaware forum-selection clause did not bind him because he only signed the 2002 and 2004 shareholder agreements that did not contain the subject clause, and therefore did not consent to a Delaware forum. *Id.* at 442. In rejecting that argument, the Texas Supreme Court found that although he did not sign the 2006 shareholder agreement, he did agree to the amendment process set out in the 2004 shareholder agreement, and he "[did] not dispute that this protocol was followed when the forum-selection clause was amended[.]" *Id.* The Court held that the amendment protocol to which the minority shareholder agreed would be "rendered meaningless" if the Court interpreted the provision to require the minority shareholder's signature to bind him to the amended agreement. *Id.* at 443. Therefore, by signing the prior agreement and

---

[2] "In resolving disputes involving forum-selection clauses, courts are not only guided by federal law, but also by drawing analogies to arbitration cases based on the recognition that clauses requiring arbitration are 'a specialized kind of forum-selection clause.'" *Casa De La Valvula S.A. Casaval S.A. v. Bray Int'l, Inc.*, No. 01-21-00143-CV, 2022 WL 1572040, at *10 n.2 (Tex. App.—Houston [1st Dist.] May 19, 2022, no pet.) (quoting *Pinto*, 526 S.W.3d at 437).

consenting to the amendment protocol, the minority shareholder "bound himself to any properly amended forum-selection clause." *Id.*

Here, Staneff executed the Original Agreement as a member of OHD. Therefore, Staneff consented to the amendment protocol contained within the Original Agreement. Because the Amended Agreement was created in accordance with the amendment protocol, Staneff is bound by the Dispute Resolution provision. The amendment protocol would be rendered meaningless if the Amended Agreement, which passed in compliance with the amendment protocol, did not bind Staneff as a member.

Staneff also argues the Amended Agreement's arbitration provision does not apply to him because employees are not included as a "Dispute Part[y]" in Section 11.14, and his claims relate only to his status as an employee. Doc. 20, Resp., 10. But this argument relates only to whether his claims fall within the scope of the arbitration agreement, not to whether there is a valid agreement to arbitrate. *See Kubala*, 830 F.3d at 202 ("Determining whether that agreement covers the claim at bar is the second step[.]"). Staneff is not only an employee of OHD; he is also a member. The plain language of Section 11.14 states "the Company, Members, and Manager . . . agree to use the following dispute resolution provisions[.]" Doc. 4, Am. Agreement, 62. Thus, Staneff, as a member of OHD, clearly agreed to arbitrate some claims. *See id.* ("[T]he first step . . . focuses only on contract formation . . ., and it is obvious that these parties validly formed an agreement to arbitrate some set of claims.").

2. <u>Defendants OHD and Simons Can Compel Staneff to Arbitrate</u>

The Court must now determine whether OHD and Simons can compel Staneff to arbitrate. "The FAA allows a party that has entered an arbitration agreement to request an order compelling the parties to proceed with arbitration." *Baker v. Cajun Energy Servs. & Rentals, LLC*, No. MO:19-CV-

37-DC, 2020 WL 3579206, at *2 (W.D. Tex. Mar. 24, 2020) (citing 9 U.S.C. § 4). "The general rule is that a party must be a signatory to an arbitration contract." *Venture v. Weyand*, No. 3:07-CV-0509-K, 2013 WL 11612228, at *2 (N.D. Tex. July 16, 2013) (Kinkeade, J.) (citing *Bridas S.A.P.I.C. v. Govt. of Turkmenistan*, 345 F.3d 347, 353 (5th Cir. 2003), *cert. denied*, 541 U.S. 937 (2004), *citing Westmoreland v. Sadoux*, 299 F.3d 462, 465 (5th Cir. 2002)). "Arbitration agreements apply to non-signatories only in rare circumstances." *Id.* (citation and internal quotation marks omitted). "Regardless, as long as there is a written agreement to arbitrate, federal courts will sometimes bind a non-signatory." *Id.* (citation omitted).

Starting with OHD, Simons executed the Amended Agreement on behalf of OHD and Sim-Metry in his capacity as manager of the respective companies. Managers are agents of the company and can enter agreements on behalf of their principal. *See* Tex. Bus. Orgs. Code Ann. § 101.254(a). Furthermore, both the Original Agreement and Amended Agreement permit the manager to enter contracts on OHD's behalf and bind it accordingly. Doc. 4-1, Orig. Agreement, 19; Doc. 4-1, Am. Agreement, 47. Therefore, OHD is a signatory to the Amended Agreement and can request an order compelling the parties to arbitrate. *See* 9 U.S.C. § 4.

Turning to Simons, although his signature is found on the Amended Agreement twice, he did not execute the Amended Agreement in his individual capacity as manager. *See* Doc. 4-1, Am. Agreement, 65. Therefore, the Court must determine if Simons can compel arbitration as a non-signatory. *See German v. Halliburton Co.*, No. 4:18-CV-00100, 2019 WL 13251161, at *1 (S.D. Tex. Mar. 20, 2019) ("Whether a non-signatory can compel arbitration pursuant to an arbitration clause questions the existence of a valid arbitration clause between specific parties and is therefore a gateway matter for the court to decide.") (citing *In re Weekley Homes, L.P.*, 180 S. W.3d 127, 130 (Tex. 2005));

*see also Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 399 (5th Cir. 2022) ("[I]t is up to [courts]—not an arbitrator—to decide whether [non-signatories] can enforce the . . . arbitration agreement."). In certain circumstances, a non-signatory can compel a signatory to arbitrate. *See Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 398 (5th Cir. 2006). "Who is actually bound by an arbitration agreement is a function of the intent of the parties, as expressed in the terms of the agreement." *Bridas S.A.P.I.C.*, 345 F.3d at 355 (5th Cir. 2003).

For example, in *Sherer*, the Fifth Circuit determined that a borrower agreed to arbitrate with a non-signatory pursuant to the broad arbitration provision within its loan agreement with a bank. *Sheer*, 548 F.3d at 382. The arbitration provision stated: [a]ll disputes, claims, or controversies arising from or relating to this Agreement or the relationships which result from this Agreement . . . shall be resolved by binding arbitration." *Id.* at 380. A loan servicer received the right to service the loan from the bank and did not sign the arbitration agreement. *Id.* The borrower then sued the loan servicer for alleged violations of fair debt practice statutes. *Id.* 380-81. The loan servicer filed a motion to compel arbitration. *Id.* at 381. In finding the borrower agreed to arbitrate with the non-signatory loan servicer, the Court noted that the borrower "agreed to arbitrate any claims arising from the relationships which result from the Agreement" and the loan servicer was the "relationship" the agreement intended to cover. *Id.* at 381-82. Finally, the Court noted that although many cases require it "to apply a theory such as equitable estoppel in order to determine whether a non-signatory may compel arbitration," those were not ones where the Court could decide the issue on the "first step" where the "terms of the agreement dictate who is actually bound by an arbitration agreement," like in this case. *Id.* at 382.

Here, Defendants appear to rely on the theory of estoppel to show Simons can compel Staneff to arbitrate. Doc 4., Mot., ¶¶ 23-24. Although the "intertwined claims estoppel test" is likely met,[3] the Court need not rely on that theory when, like in *Sherer*, "the terms of the [Amended] [A]greement dictate who is actually bound by the" Dispute Resolution provision. *Sherer*, 548 F.3d at 382.

Here, it is clear from the plain text of the Amended Agreement that Staneff agreed to arbitrate with Simons. The Amended Agreement requires OHD, its members, and manager to use its Dispute Resolution provision "to resolve any dispute by, between, and amongst" them. *See* Doc. 4-1, Am. Agreement, 62. Simons is the manager the agreement intended to cover. *Id.* at 39 (naming Justin Simons as OHD's Manager); *see Sherer*, 548 F.3d at 381. Therefore, the broad language of the Dispute Resolution provision "clearly identif[ies] when [Staneff] may be compelled to arbitrate with a non-signatory" manager, like Simons. *Id.* at 382.

B.      *The Delegation Clause Referring Questions of Arbitrability to the Arbitrator is Valid*

Having found a valid agreement to arbitrate, the Court next decides "if the purported delegation clause" in Section 11.14(c) is valid. *Marquez v. US Foods, Inc.*, No. 3:23-CV-2455-K, 2024 WL 3625674, at *2 (N.D. Tex. July 31, 2024) (Kinkeade, J.) ("After finding that an agreement

---

[3] "Intertwined claims estoppel involves 'compel[ling] arbitration when a nonsignatory defendant has a 'close relationship' with one of the signatories and the claims are 'intimately founded in and intertwined with the underlying contract obligations.'" *Cigniti Techs. Inc. v. Govinsadamy*, No. 3:23-CV-2460-L, 2024 WL 4329021, *8 (N.D. Tex. Aug. 7, 2024), *report and recommendation adopted*, No. 3:23-CV-2460-L, 2024 WL 4360144 (N.D. Tex. Sept. 30, 2024) (Lindsay, J.) (citing *Hays v. HCA Holdings, Inc.*, 838 F.3d 605, 610 (5th Cir. 2016) (other citations omitted). Here, Simons, as OHD's manager, is an agent of OHD, *see* Tex. Bus. Orgs. Code Ann. § 101.254(a), and "close relationships typically include a non-signatory owner, agent, or parent of a signatory company." *Cigniti Techs. Inc.*, 2024 WL 4329021 at *8 (citations omitted). Furthermore, Staneff brings identical FLSA claims against Simons and OHD and raises virtually the same factual allegations against Simons and OHD, referring to them as "the Defendants" in his complaint. Doc. 1, Compl.; *see Hays*, 838 F.3d at 12.

to arbitrate was formed, the court's second step is then limited to determining whether there is a valid delegation clause." (citing *Maravilla v. Gruma Corp.*, 783 F. App'x 392, 394 (5th Cir. 2019)). A "purported delegation clause is in fact a delegation clause . . . if it evinces an intent to have the arbitrator decide whether a claim must be arbitrated." *Kubala*, 830 F.3d at 202 (citation omitted). It is the burden of the party moving for the arbitrator to decide arbitrability to show "clearly and unmistakably that the parties agreed to have the arbitrator decide that threshold question." *Hous. Refin., L.P. v. United Steel, Paper & Forestry, Rubber, Mfg.*, 765 F.3d 396, 408 (5th Cir. 2014) (citation omitted). "[A] valid delegation clause requires the court to refer a claim to arbitration to allow the arbitrator to decide gateway arbitrability issues." *Kubala*, 830 F.3d at 202.

The Fifth Circuit has found a delegation clause to be valid and enforceable when it is "strikingly similar" to the delegation clause the Supreme Court found valid in *Rent–A–Ctr., W., Inc. v. Jackson*, 561 U.S. 63 (2010). *See Kubala*, 830 F.3d at 204 (citing *Rent-A-Ctr.*, 561 U.S. at 66-69). The valid delegation clause from *Rent-A-Center* stated: "[T]he Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of this Agreement[.]" 561 U.S. at 66.

Here, Section 11.14(c) of the Dispute Resolution provision states: "THE ARBITRABILITY OF ANY DISPUTE, CLAIM, CAUSE OF ACTION, AND/OR ASSERTION OF LIABILTY AND/OR DAMAGES SHALL BE DETERMINED BY THE ARBITRATOR." Doc 4-1, Am. Agreement, 63. The Court finds that the delegation clause at issue here, which requires "the arbitrability of any dispute to be determined by the arbitrator," is "strikingly similar" to the broad language used in *Rent-A-Center*. *See Kubala*, 830 F.3d at 204; *Gay v. Manchester Mgmt., LLC*, No. 3:18-CV-1378-D, 2018 WL 5255267, at *5 (N.D. Tex. Oct. 22, 2018) (Fitzwater, S.J.) ("[The] strong

presumption in favor of arbitration applies with even greater force when the parties include broad language in the arbitration agreement." (citation modified).

Moreover, in *Petrofac*, the Fifth Circuit held "the express adoption of these [AAA] rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012) (citations omitted). The AAA rules state "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." *Id.* Here, the Amended Agreement expressly incorporated the AAA rules: "BINDING ARBITRATION [is to be] CONDUCTED BY THE AMERICAN ARBITRATION ASSOCIATION AND ITS COMMERCIAL PANEL UNDER THE AMERICAN ARBITRATION ASSOCIATION'S COMMERCIAL RULES." Doc 4-1, Am. Agreement, 62-63.

Therefore, the delegation clause in the Amended Agreement is valid and enforceable because it is clear the parties intended to have the arbitrator decide whether a claim must be arbitrated.

C.  *Attorneys' Fees*

In their Motion, Defendants request this Court award them attorneys' fees and costs incurred in seeking to enforce the arbitration agreement in accordance with Section 11.14(d) of the Amended Agreement. *See* Doc. 4, Mot., 19-20.

Based on the valid delegation clause, the court declines to award attorneys' fees at this time. Instead, the court refers the issue to the arbitrator to first determine the arbitrability of the attorneys' fees claim. *Alonzo v. Harden Home Health, LLC*, No. 1:18-CV-694-RP, 2018 WL 6262959, at *3-4 (W.D. Tex. Nov. 13, 2018) ("[I]f a court finds there is a valid agreement to submit questions of arbitrability to an arbitrator, the court should "give considerable leeway to the arbitrator[.]"). The

Court therefore denies without prejudice Defendants' request for attorneys' fees. *See Marquez*, No. 3:23-CV-2455-K, 2024 WL 3625674, at *7 ("Pursuant to the clear language of the delegation clause, whether Defendant is entitled to these [attorneys'] fees is for the arbitrator to decide . . . . The Court denies without prejudice Defendant's request for attorneys' fees as this is an issue reserved for the arbitrator.").

## IV.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Compel Arbitration. The Court **ORDERS** the parties to arbitrate their dispute as required by the Amended Agreement. The Court **DENIES WITHOUT PREJUDICE** Defendants' request for attorneys' fees. The case is **STAYED** for arbitration, and the Clerk of Court is instructed to administratively close this case pending arbitration. The Parties are **ORDERED** to provide joint status reports regarding arbitration every 90 days, with the first report due on **January 26, 2026**.

SO ORDERED.

SIGNED: October 28, 2025.

_____
JANE J. BOYLE
SENIOR UNITED STATES DISTRICT JUDGE